**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: ndeckant@bursor.com
          jvenditti@bursor.com

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III (State Bar No. 320783)
888 Seventh Avenue
New York, NY  10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email: fklorczyk@bursor.com

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA KAPLAN, JOHN MURPHY, JOHNNY PAPPAS, MICHAEL TISA, and CHARLENE EGIZI, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiffs,<br><br>        v.<br><br>THE ATHLETIC MEDIA COMPANY,<br><br>                                    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Rebecca Kaplan, John Murphy, Johnny Pappas, Michael Tisa, and Charlene Egizi ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant The Athletic Media Company ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its subscription plans for The Athletic (collectively, the "Athletic Subscriptions") through its website at https://theathletic.com and on its mobile application (the "Athletic Website" and the "Athletic App," respectively).

2.      Defendant is an international media company that, among other activities, publishes and distributes The Athletic, including both its print and online editions. Relevant to Plaintiffs' allegations, when consumers sign up for The Athletic Subscriptions at the Athletic Website or on the Athletic App, Defendant actually enrolls consumers in a program that automatically renews customers' Athletic Subscriptions from month-to-month or year-to-year and results in monthly or annual charges to the consumer's credit card, debit card, or third party payment account (collectively, "Payment Method"). In doing so, however, Defendant fails to provide the requisite disclosures and authorizations required to be made pursuant to California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*.

3.      Pursuant to the ARL, online retailers who offer automatically renewing subscriptions to California consumers must: (a) obtain affirmative consent prior to the consumer's purchase; (b) provide the complete auto-renewal terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to the purchase; and (c) provide an acknowledgment identifying an easy and efficient mechanism for consumers to cancel their subscriptions. As will be discussed below, the enrollment process for the Athletic Subscriptions, which can be completed through the Athletic Website, Athletic Apps, and/or Athletic Website, uniformly violates each of these requirements. Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their Athletic Subscriptions.

4.      Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1); (ii) charging consumers' Payment Method without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2); and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of Sections 17602(a)(3) and 17602(b). Cal. Bus. & Prof. Code §§ 17602(a)(l), (a)(2), (a)(3), (b). As a result, all goods, wares, merchandise, or products sent to Plaintiffs and the Class under the automatic renewal of continuous service agreements are deemed to be "unconditional gifts" under the ARL. Cal. Bus. & Prof. Code § 17603.

5.      Accordingly, Plaintiffs bring this action individually and on behalf of all California purchasers of any of Defendant's Athletic Subscription offerings who, within the applicable statute of limitations period up to and including the date of judgment in this action, incurred unauthorized fees for the renewal of their Athletic Subscriptions. Based on Defendant's unlawful conduct, Plaintiffs seek damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (ii) conversion; (iii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (iv) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (v) unjust enrichment/restitution; (vi) negligent misrepresentation; and (vii) fraud.

## PARTIES

6.      Text foregoing allegations are hereby reincorporated by reference as if fully restated herein.

7.      Plaintiff Rebecca Kaplan is a citizen of Oakland, California, Alameda County.

8.      Plaintiff John Murphy is a citizen of Highland, California, San Bernardino County.

9.      Plaintiff Johnny Pappas is a citizen of San Diego California, San Diego County.

1       10.      Plaintiff Michael Tisa is a citizen of San Diego California, San Diego County.

2       11.      Plaintiff Charlene Egizi is a citizen of Hermet California, Hermet County.

3       12.      Defendant The Athletic Media Company is a Delaware Corporation with its principal place of business in California. Defendant markets to consumers through *The Athletic* Website and App. Defendant is also responsible for the promotion, advertisement, and/or marketing of the automatically renewing subscription plans for *The Athletic*, and it owns and operates the Athletic Website and App, where it markets and sells it's the Athletic Subscriptions. Defendant sells The Athletic Subscriptions in California and has done business throughout California, and throughout the United States, at all times during the Class Period. Defendant also made automatic renewal or continuous service offers to consumers in California, and throughout the United States, via the Athletic Website and/or App during the Class Period.

## JURISDICTION AND VENUE

13.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005 ("CAFA"), because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

14.      This Court has personal jurisdiction over Defendant because Plaintiffs resides in California, are citizens of California, and submit to the jurisdiction of the Court, and because Defendant is headquartered in this District. Additionally, Plaintiffs purchased their Athletic Subscriptions from Defendant while in California.

15.      Venue is proper is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Also, Defendant is a resident of this District, and Plaintiffs reside in this District and purchased Defendant's Athletic Subscription in this District.

## FACTUAL ALLEGATIONS

### A.    Background On The Subscription e-Commerce Market

16.    The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[1] Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years. Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[2] Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[3] That constitutes an average annual growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally."[4]

17.    The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years. According to Forbes, "[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M

---

[1] *See* https://www.coredna.com/blogs/ecommerce-subscription-services.

[2] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[3] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%."). *See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (Oct. 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but-are-you-reaping-the-full-benefits-02434851.

[4] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); *see also* Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

---

in 2011."[5] Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[6] "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[7] Thus, "[t]he share prices of most subscription companies have performed well in recent years."[8]

18.    The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[9] According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[10]

19.    However, as the *Washington Post* has noted, there are downsides associated with the subscription-based business model.[11] While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to

---

[5] *The State Of The Subscription Economy, 2018*, Forbes (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[6] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[7] *Id*.

[8] *Id*.

[9] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[10] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[11] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

the "highly competitive prices and broad similarities among the leading players."[12]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[13] Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[14] As these companies have realized, "[t]he real money is in the inertia."[15] As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[16] That is, to facilitate consumer inertia, a number of subscription e-commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this by [among other things] intentionally confusing users with their [website or] app's design and flow, by making promises of 'free trials' that convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of its automatic-renewal programs.[17]

20.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[18] Moreover, "the rapid growth of subscriptions has created a host of

---

[12] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers* (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[13] *Id.*

[14] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[15] *Id.*

[16] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

[17] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[18] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New

---

challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[19] Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts[ and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[20] widespread utilization of misleading dark patterns and deliberate omissions persist. A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do, such as ... signing up for recurring bills."[21]

21.    Defendant has successfully implemented these tactics. Indeed, Defendant's recent growth in revenues and subscriber count with respect to its Athletic Subscriptions coincides with a sharp decline in subscriber satisfaction as the Athletic Subscriptions and the platforms from which they operate have become riddled with "dark patterns." Specifically, Defendant has been using various types of dark patterns, including but not limited to "roach motel,"[22] "misdirection,"[23] and "forced continuity,"[24] in order to prevent user unsubscription from the Athletic Subscriptions by adopting complex cancellation procedures to increase the friction in the subscription cancellation process. Defendant's utilization of these dark patterns – especially in conjunction with its failure to

---

Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[19] *Id.*

[20] *Id.*

[21] *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[22] "Roach motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)." https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[23] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another." In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening[.]" https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[24] One example of "forced continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service[ that] comes to an end and [their] credit card silently starts getting charged without any warning. [The subscriber is] are then not given an easy way to cancel the automatic renewal." https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

---

1  fully disclose the terms of its automatic-renewal programs (discussed further below) – has led to a

2  reduction in churn rates by making it next to impossible for subscribers to cancel their Athletic

3  Subscriptions.  It has further led to an increase in accidental or unintentional sign-ups by

4  consumers for paid Athletic Subscription plans, in effect increasing subscriber count and, thus,

5  Defendant's overall revenues from renewal fees.

6  **B.    California's Automatic Renewal Law**

7  22.    In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"),

8  Cal. Bus. & Prof. Code §§ 17600, *et seq.*, with the intent to "end the practice of ongoing charging

9  of consumer credit or debit cards or third party payment accounts without the consumers' explicit

10  consent for ongoing shipments of a product or ongoing deliveries of service." Cal. Bus. & Prof.

11  Code § 17600 (statement of legislative intent). More recently, in 2018, California's Senate Bill 313

12  amended Section 17602 of the ARL, adding new requirements meant to increase consumer

13  protections for, among other things, orders that contain free trial and promotional pricing, and

14  subscription agreements entered into online.

15  23.    The ARL makes it "unlawful for any business making an automatic renewal or

16  continuous service offer to a consumer in this state to do any of the following:"

17  (1)  Fail to present the automatic renewal offer terms or continuous
18  service offer terms in a clear and conspicuous manner before the
   subscription or purchasing agreement is fulfilled and in visual
19  proximity, or in the case of an offer conveyed by voice, in temporal
   proximity, to the request for consent to the offer.  If the offer also
20  includes a free gift or trial, the offer shall include a clear and
   conspicuous explanation of the price that will be charged after the
21  trial ends or the manner in which the subscription or purchasing
   agreement pricing will change upon conclusion of the trial.

22  (2)  Charge the consumer's credit or debit card, or the consumer's
   account with a third party, for an automatic renewal or continuous
23  service without first obtaining the consumer's affirmative consent to
   the agreement containing the automatic renewal offer terms or
24  continuous service offer terms, including the terms of an automatic
   renewal offer or continuous service offer that is made at a
25  promotional or discounted price for a limited period of time.

26  (3)  Fail to provide an acknowledgment that includes the automatic
   renewal offer terms or continuous service offer terms, cancellation
27  policy, and information regarding how to cancel in a manner that is
   capable of being retained by the consumer.  If the automatic renewal
28  offer or continuous service offer includes a free gift or trial, the

business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3)

24. Section 17602(c) of the ARL further provides:

A business that makes an automatic renewal offer or continuous service offer shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(c).

25. Additionally, following the 2018 and 2022 amendments to the ARL, the updated law requires e-commerce sellers doing business in California to allow online cancellation of auto-renewing memberships or recurring purchases that were initiated online. Specifically, Section 17602(d) provides:

[A] business that allows a consumer to accept an automatic renewal or continuous service offer online shall allow a consumer to terminate the automatic renewal or continuous service *exclusively online*, *at will*, *and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal or continuous service immediately*.

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).

26. The updated ARL also requires a seller who provides an automatic offer that includes a free gift, trial, or promotional pricing to notify consumers about how to cancel the auto-renewal before they are charged. Sellers must also explain the price to be charged when the promotion or free trial ends. If the initial offer is at a promotional price that is only for a limited time and will increase later, the seller must obtain consumer consent to the non-discounted price prior to billing.

27. Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." Cal. Bus. & Prof. Code § 17601(a).

28. Section 17601(b) of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing

agreement will continue until the consumer cancels. (2) The description of the cancellation policy that applies to the offer. (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known. (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer. (5) The minimum purchase obligation, if any." Cal. Bus. & Prof. Code § 17601(b).

29.     Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbol ls or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c).

30.     Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent," the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business." Cal. Bus. & Prof. Code § 17603.

31.     As alleged below, Defendant's practices on the Athletic/Vendor Websites and Apps systematically violate Sections 17602(a)(l), 17602(a)(2), and 17602(a)(3) of the ARL.

**C.     Defendant's Business: The Subscription Enrollment Process**

32.     At all relevant times, Defendant offered, via the Athletic Website and App, various Athletic Subscriptions for *The Athletic*, a publication available in digital formats. These paid subscriptions are offered on a recurring basis for monthly and/or yearly renewal terms, and all plans automatically renew at the end of the defined renewal term unless the subscriber cancels. For example, customers that sign up for a *monthly* The Athletic Subscription are, at the end of the initial one-month period, automatically renewed and typically charged the full amount for the next month, and every month thereafter if they do not cancel. Defendant's Athletic Subscriptions

1   constitute automatic renewal and/or continuous service plans or arrangements for the purposes of

2   Cal. Bus. & Prof. Code §§ 17600, *et seq*.

3       33.     Consumers can sign up for one of Defendant's subscription plans through the

4   Athletic Website, on either its mobile or desktop format, or Defendant's mobile application.

5   Defendant provides monthly and/or yearly subscription plans. Customers who purchase an Athletic

6   Subscription via the Athletic Website or App are automatically enrolled by Defendant in their

7   chosen Athletic Subscription program going forward, by default.

8       34.     The enrollment process for the Athletic Subscriptions is substantially the same,

9   regardless of the medium used. For instance, after selecting one of the Athletic Subscription plans,

10  those navigating the enrollment process on the Athletic Website are prompted to create an account.

11  Consumers are directed to a final webpage (the "Checkout Page"), where prospective subscribers

12  are prompted to input their payment information and then invited to complete their purchase. For

13  the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to

14  the text of that portion of the Checkout Page that appears "in visual proximity to the request for

15  consent to the offer," which in this case pertains to text nearby the final checkout button at the

16  bottom of the Checkout Page that customers must click in order to complete the checkout process.

17  The following is an accurate picture of the Checkout Page:

35.     On the Checkout Page depicted above, when a consumer signs up for a monthly Athletic Subscription, the "relevant portion of the Checkout Page" refers to the disclosures in the block of text immediately below the black "Subscribe" button (*i.e.*, the "request for consent").

36.     Regardless of how the consumer subscribes (via the Athletic Website or the Athletic Apps), and irrespective of which specific Athletic Subscription plan the subscriber selects, Defendant fails to adequately disclose the terms of its auto-renewal programs either before or after checkout, and it never requires the individual consumer to read or affirmatively agree to any terms of service, *i.e.*, by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the checkout process and submit their orders for their Athletic Subscriptions. Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – their subscribers before charging consumers' Payment Methods on a recurring basis.

1

2    **D.**    **Defendant Violates California's Auto Renewal Law**

3        37.    At all relevant times, Defendant failed to comply with the ARL in three ways: (i)

4    Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner

5    and in visual proximity to the request for consent to the offer before the subscription or purchasing

6    agreement was fulfilled, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (ii) Defendant

7    charged Plaintiffs' and Class members' Payment Methods without first obtaining their affirmative

8    consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. &

9    Prof. Code § 17602(a)(2); and (iii) Defendant failed to provide an acknowledgment that included

10   the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in

11   a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code

     §§ 17602(a)(3).

12            **1.    Defendant Fails To Clearly And Conspicuously Present**
                      **The Athletic Subscription Terms Before The Subscription**
13                    **Agreement Is Fulfilled And In Visual Proximity To The**
                      **Request For Consent To The Offer.**

14       38.    First, the relevant portion of the Checkout Page does not present the complete

15   "automatic renewal offer terms," as defined by Cal. Bus. & Prof. Code §17601(b), in violation of

16   Section 17602(a)(1) of the ARL. Specifically, Defendant fails to present a complete "description of

17   the cancellation policy that applies to the offer." Cal. Bus. & Prof. Code § 17601(b)(2). For

18   instance, the Checkout Page does not mention *how* subscribers can cancel their subscription or by

19   *when* cancellation must be affected in order to avoid further renewal charges for the subsequent

20   subscription periods. And although the relevant portion of the Checkout Page includes a link to

21   Defendant's private policy webpage – where cancellation terms are disclosed only after clicking an

22   obscure "Payment Terms" button on the left side of the screen – and states, "For more details on

23   our payment terms and how to cancel, click here," these hyperlinks and any terms embedded in the

24   corresponding webpages fails to satisfy the ARL for two reasons. First, these hyperlinks are not

25   "clear and inconspicuous" as the ARL requires because they are presented in grey text located

26   *below* the black "Subscribe" button. Thus, the required information cannot be disclosed below the

27   request for consent without violating the ARL, given that the ARL explicitly requires the

28

disclosures to be made "**before** the subscription or purchasing agreement is fulfilled, and in visual proximity[] … to the request for consent to the offer." Cal. Bus. & Prof. Code § 17602(a)(1) (emphasis added); *see also id.* § 17602(f) ("The requirements of [Cal. Bus. & Prof. Code § 17602(a)] … apply only **prior** to the completion of the initial order for the automatic renewal or continuous service[.]") (emphasis added). That is, since customers must click the black "Subscribe" button (*i.e.*, the request for consent) on the Checkout Page in order to complete the checkout process, in context the term "before" is interchangeable with "above." This makes sense, given that a reasonable consumer would believe that all material terms and any information of note would appear on the Checkout Page before their consent is elicited or given. Putting that together, Defendant must have provided the required disclosures *above* the black "Subscribe" button of the Checkout Page, and information provided after or "following" the black checkout button cannot satisfy the ARL. Further, given its placement and gray color, the text of this hyperlink is quintessential fine print, and is therefore not "clear and inconspicuous" as the ARL requires. Since businesses' "inclusion of autorenewal terms in fine print" was "the practice that led to ARL" in the first place, *Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1140 n.6 (S.D. Cal. 2021) (citation omitted), 517 F. Supp. 3d at 1139-40, such text cannot satisfy the ARL. Second, reference to hyperlinks leading to required disclosures set forth on other pages of the Athletic Website and/or App is not tantamount to disclosure of them. It is not enough that the cancellation policy may be set forth on the hyperlinked pages located elsewhere on the Athletic Website; the ARL requires that Defendant present its full cancellation policy directly on the Checkout Page – and it must further do so "clearly and conspicuously," *id.* § 17601(c), and with the requisite "visual proximity … to the request for consent," *id.* § 17602(a)(1) (*i.e.*, they must appear in the block of text immediately above the "Subscribe" button on that page) – so as to allow the consumer to read and review the applicable offer terms immediately prior to purchase. However, Defendant failed, and continues to fail, to satisfy that requirement, in violation of Section 17602(a)(1) of the ARL.

39.    For the same reasons, Defendant's Checkout Page also fails to does not clearly and conspicuously disclose: that the Athletic Subscription "will continue until the consumer cancels" (Cal. Bus. & Prof. Code § 17601(b)(1)); "[t]he recurring charges that will be charged" to the

1    subscriber's Payment Method each billing period (*id*. § 17601(b)(3)); or "[t]he length of the

2    automatic renewal term" (*id*. § 17601(b)(4)).

3              **2.      Defendant Fails To Obtain Consumers' Affirmative
                        Consent To The Automatic Renewal Terms Associated
4                       With The Athletic Subscriptions.**

5         40.     Second, at no point during the checkout process does Defendant require consumers

6    to read or affirmatively agree to any terms of service associated with their Athletic Subscriptions,

7    *e.g.*, by requiring consumers to select or click a "checkbox" next to the automatic renewal offer

8    terms to complete the checkout process.

9         41.     Accordingly, when Defendant automatically renews customers' The Athletic

10   Subscriptions, Defendant charges consumers' Payment Methods without first obtaining their

11   affirmative consent to the agreement containing the automatic renewal offer terms, in violation of

12   Cal. Bus. & Prof. Code § 17602(a)(2).

13             **3.      Defendant Fails To Provide A Post-Checkout
                        Acknowledgment That Includes Clear And Conspicuous
14                      Disclosures Of Required Athletic Subscription Offer
                        Terms.**

15        42.     Finally, after Plaintiffs and the members of the Class subscribed to one of

16   Defendant's Athletic Subscription plans, Defendant sent to Plaintiffs and the Class email follow-

17   ups regarding their purchases (the "Acknowledgment Email"). The Acknowledgment Email

18   contains even less of the required information than is featured on the relevant portion of the

19   Checkout Page, discussed above. Namely, the Acknowledgment Email does not provide: that the

20   Athletic Subscription "will continue until the consumer cancels," Cal. Bus. & Prof. Code §

21   17601(b)(1); a "description of the cancellation policy that applies to the offer," *id*. § 17601(b)(2); a

22   statement of "[t]he recurring charges that will be charged to the consumer's [Payment Method] as

23   part of the automatic renewal plan or arrangement, and that the amount of the charge may change[,

24   and,] if that is the case, and the amount to which the charge will change," *id*. § 17601(b)(3); or

25   "[t]he length of the automatic renewal term," *id*. § 17601(b)(4). As such, the Acknowledgment

26   Email fails to "include[] the automatic renewal offer terms … , cancellation policy, and

27

28

1   information regarding how to cancel in a manner that is capable of being retained by the consumer"

2   in violation of Section 17602(a)(3) of the ARL.

3        43.    In sum, Defendant's deficient pre- and post-purchase disclosures and lack of

4   affirmative consent fail to comply with the ARL.  By and through these actions, Defendant has

5   charged Plaintiffs' and Class members' Payment Methods in direct violation of the ARL. As a

6   result, all goods, wares, merchandise, or products sent to Plaintiffs and the Class under the

7   automatic renewal of continuous service agreements are deemed to be "unconditional gifts"

8   pursuant to Cal. Bus. & Prof. Code § 17603.

9        44.    Because Defendant failed to disclose this material information in the manner

10   required by statute, Plaintiffs were was unable at the point of sale to accept or provide affirmative

11   consent to Defendant's offer or knowingly enter into to the purchase agreements. Thus, as a direct

12   result of Defendant's missing, incomplete, and otherwise deficient disclosures on the Checkout

13   Page and in the Acknowledgment Email, Plaintiffs were induced to sign up for, unable to

14   terminate, and automatically charged for their Athletic Subscriptions.

15   **PLAINTIFF'S INDIVIDUAL ALLEGATIONS**

16   **A.**    **Rebecca Kaplan**

17        45.    Plaintiff Rebecca Kaplan is an individual consumer who purchased a monthly

18   digital Athletic Subscription from Defendant's website while in California or around February 28,

19   2020. Ms. Kaplan signed up for her Athletic Subscription at the promotional or discounted rate of

20   $4.00 a month. At the time of enrollment, Ms. Kaplan provided her PayPal account information

21   directly to Defendant.

22        46.    Before Ms. Kaplan purchased her Athletic Subscription, Defendant did not disclose

23   to Ms. Kaplan all required automatic renewal offer terms associated with the subscription program.

24   Additionally, although the Checkout Page from which Ms. Kaplan made her purchase included

25   some relevant information regarding automatic renewal, the manner in which this information was

26   presented was insufficient to put Ms. Kaplan on notice. Specifically, prior to completing her initial

27   Athletic Subscription order, the relevant screens and buttons presented to Ms. Kaplan did not

28   clearly and conspicuously state that her Athletic Subscription would automatically renew every

month until she cancelled, and they did not describe the full cancellation policy that applied to her purchase.

47.     After Ms. Kaplan completed her initial order, Defendant sent Ms. Kaplan an acknowledgment email that her Athletic Subscription had been activated. However, that acknowledgement email failed to provide Ms. Kaplan with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Ms. Kaplan's Athletic Subscription in a manner capable of being retained by her. Ms. Kaplan did not receive any other acknowledgements that contain the required information.

48.     As a result of Defendant's missing and otherwise deficient disclosures, when Ms. Kaplan selected and paid for her discounted Athletic Subscription in or around, she was unaware that Defendant enrolled her in an "automatic renewal" program under which the subscription would renew each month at varying rates unless Ms. Kaplan chose to cancel.

49.     Ms. Kaplan's card was charged a number of unauthorized times by Defendant until her last payment on May of 2022.

**B.     John Murphy**

50.     John Murphy is an individual consumer who purchased a monthly digital Athletic Subscription from Defendant's website while in California on or around December 2018. Mr. Murphy signed up for his Athletic Subscription at the promotional or discounted rate of $1.99 a month. At the time of enrollment, Mr. Murphy provided his payment information directly to Defendant.

51.     Before Mr. Murphy purchased his Athletic Subscription, Defendant did not disclose to Mr. Murphy all required automatic renewal offer terms associated with the subscription program. Additionally, although the Checkout Page from which Mr. Murphy made his purchase included some relevant information regarding automatic renewal, the manner in which this information was presented was insufficient to put Mr. Murphy on notice. Specifically, prior to completing his initial Athletic Subscription order, the relevant screens and buttons presented to Mr. Murphy did not clearly and conspicuously state that his Athletic Subscription would automatically

renew every month until he cancelled, and they did not describe the full cancellation policy that applied to his purchase.

52.     After Mr. Murphy completed his initial order, Defendant sent Mr. Murphy an acknowledgment email that his Athletic Subscription had been activated. However, that acknowledgement email failed to provide Mr. Murphy with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Mr. Murphy's Athletic Subscription in a manner capable of being retained by him. Mr. Murphy did not receive any other acknowledgements that contain the required information.

53.     As a result of Defendant's missing and otherwise deficient disclosures, when Mr. Murphy selected and paid for his discounted Athletic Subscription, he was unaware that Defendant enrolled him` in an "automatic renewal" program under which the subscription would renew each month at varying rates unless Mr. Murphy chose to cancel.

54.     Mr. Murphy's card was charged a number of unauthorized times by Defendant until his last payment on February of 2022.

**C.     Johnny Pappas**

55.     Johnny Pappas is an individual consumer who purchased a monthly digital Athletic Subscription from Defendant's website while in California on or around June of 2020. Mr. Pappas signed up for his Athletic Subscription at the promotional or discounted rate of $1.99 a month. At the time of enrollment, Mr. Pappas provided his payment information directly to Defendant.

56.     Before Mr. Pappas purchased his Athletic Subscription, Defendant did not disclose to Mr. Pappas all required automatic renewal offer terms associated with the subscription program. Additionally, although the Checkout Page from which Mr. Pappas made his purchase included some relevant information regarding automatic renewal, the manner in which this information was presented was insufficient to put Mr. Pappas on notice. Specifically, prior to completing his initial Athletic Subscription order, the relevant screens and buttons presented to Mr. Pappas did not clearly and conspicuously state that his Athletic Subscription would automatically renew every

month until he cancelled, and they did not describe the full cancellation policy that applied to his purchase.

57.     After Mr. Pappas completed his initial order, Defendant sent Mr. Pappas an acknowledgment email that his Athletic Subscription had been activated. However, that acknowledgement email failed to provide Mr. Pappas with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Mr. Pappas's Athletic Subscription in a manner capable of being retained by him. Mr. Pappas did not receive any other acknowledgements that contain the required information.

58.     As a result of Defendant's missing and otherwise deficient disclosures, when Mr. Pappas selected and paid for his discounted Athletic Subscription, he was unaware that Defendant enrolled him in an "automatic renewal" program under which the subscription would renew each month at varying rates unless Mr. Pappas chose to cancel.

59.     Mr. Pappas's card was charged a number of unauthorized times by Defendant until his last payment on February of 2021.

**D.     Michael Tisa**

60.     Michael Tisa is an individual consumer who purchased a monthly digital Athletic Subscription from Defendant's website while in California on or around January of 2019. Mr. Tisa signed up for his Athletic Subscription at the free trial price. At the time of enrollment, Mr. Tisa provided his payment information directly to Defendant.

61.     Before Mr. Tisa purchased his Athletic Subscription, Defendant did not disclose to Mr. Tisa all required automatic renewal offer terms associated with the subscription program. Additionally, although the Checkout Page from which Mr. Tisa made his purchase included some relevant information regarding automatic renewal, the manner in which this information was presented was insufficient to put Mr. Tisa on notice. Specifically, prior to completing his initial Athletic Subscription order, the relevant screens and buttons presented to Mr. Tisa did not clearly and conspicuously state that his Athletic Subscription would automatically renew every month

1    until he cancelled, and they did not describe the full cancellation policy that applied to his

2    purchase.

3        62.    After Mr. Tisa completed his initial order, Defendant sent Mr. Tisa an

4    acknowledgment email that his Athletic Subscription had been activated. However, that

5    acknowledgement email failed to provide Mr. Tisa with the complete automatic renewal terms that

6    applied to Defendant's offer, a description of Defendant's full cancellation policy, or information

7    regarding how to cancel Mr. Tisa's Athletic Subscription in a manner capable of being retained by

8    him. Mr. Tisa did not receive any other acknowledgements that contain the required information.

9        63.    As a result of Defendant's missing and otherwise deficient disclosures, when Mr.

10   Tisa selected and paid for his discounted Athletic Subscription, he was unaware that Defendant

11   enrolled him in an "automatic renewal" program under which the subscription would renew each

12   month at varying rates unless Mr. Tisa chose to cancel.

13       64.    Mr. Tisa's card was charged a number of unauthorized times by Defendant until his

14   last payment on June of 2022.

15       **E.    Charlene Egizi**

16       65.    Charlene Egizi is an individual consumer who purchased a monthly digital Athletic

17   Subscription from Defendant's website while in California on or around December 2018. Ms. Egizi

18   signed up for his Athletic Subscription at the free trial rate. At the time of enrollment, Ms. Egizi

19   provided his payment information directly to Defendant.

20       66.    Before Ms. Egiz purchased his Athletic Subscription, Defendant did not disclose to

21   Ms. Egizi all required automatic renewal offer terms associated with the subscription program.

22   Additionally, although the Checkout Page from which Ms. Egizi made their purchase included

23   some relevant information regarding automatic renewal, the manner in which this information was

24   presented was insufficient to put Ms. Egizi on notice. Specifically, prior to completing her initial

25   Athletic Subscription order, the relevant screens and buttons presented to Ms. Egizi did not clearly

26   and conspicuously state that her Athletic Subscription would automatically renew every month

27   until she cancelled, and they did not describe the full cancellation policy that applied to her

28   purchase.

67.     After Mr. Egizi completed his initial order, Defendant sent Mr. Egizi an acknowledgment email that her Athletic Subscription had been activated. However, that acknowledgement email failed to provide Mr. Egizi with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Ms. Egizi's Athletic Subscription in a manner capable of being retained by her. Ms. Egizi did not receive any other acknowledgements that contain the required information.

68.     As a result of Defendant's missing and otherwise deficient disclosures, when Ms. Egizi selected and paid for her discounted Athletic Subscription she was unaware that Defendant enrolled him in an "automatic renewal" program under which the subscription would renew each month at varying rates unless Mr. Egizi chose to cancel.

69.     Ms. Egizi's card was charged a number of unauthorized times by Defendant until her last payment on May of 2022.

* * *

70.     As a direct result of Defendant's unlawful conduct described above, Plaintiffs suffered economic injury.  Specifically, Defendant's ARL violations caused Plaintiffs financial injury because they reasonably relied on Defendant's conspicuous disclosures of the Checkout Page and the Acknowledgment Email (and, as a natural corollary, Defendant's omissions and/or the inconspicuousness of the disclosures contained therein) in deciding whether to purchase their Athletic Subscriptions in the first place and whether to continue paying for it after that (*i.e.*, by not cancelling the auto-renewal).  Had Defendant complied with the ARL by adequately disclosing – and obtaining Plaintiffs' affirmative consent to – the requisite Athletic Subscription terms on the Checkout Page at the point of Plaintiffs' initial enrollments, they would have been able to read and review the auto renewal terms prior to purchase and they would have not subscribed to the Athletic, thereby avoiding financial injury of any kind as a result of Defendant's ARL violations. Similarly, had Defendant complied with the ARL by adequately disclosing the terms associated with Plaintiffs' Athletic Subscriptions in the post-checkout Acknowledgment Email (*i.e.*, after initial enrollment but before any one of the several times Defendant subsequently automatically

renewed Plaintiffs' Athletic Subscriptions and charged their Payment Methods accordingly), they would have been able to read and review the auto renewal terms prior to renewal, and they would have canceled their Athletic Subscriptions prior to the expiration of the subscription period in which they learned such information, thereby avoiding all or part of the automatic renewal charges Plaintiffs incurred from during the lives of their Athletic Subscriptions.  But Defendant did not adequately disclose the required automatic renewal terms in either the Checkout Page or the Acknowledgment Email, thereby depriving Plaintiffs of the opportunity to make an informed decision as to the transaction.

71.     The facts giving rise to Plaintiffs' claims are materially the same as the Class they seek to represent.

## CLASS ACTION ALLEGATIONS

72.     Plaintiffs bring this action pursuant to Federal Rule 23 on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All persons in California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred renewal fee(s) in connection with Defendant's *The Athletic* subscription offerings.

73.     Specifically excluded from the Class are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

74.     Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

75.     **Numerosity:** Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, the Class comprises at least tens or hundreds of thousands of consumers throughout California. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

1         76.    **Commonality and Predominance:** Common questions of law and fact exist as to

2    all Class members and predominate over questions affecting only individual Class members.

3    Common legal and factual questions include, but are not limited to: (a) whether Defendant's The

4    Athletic Subscriptions constitute "Automatic renewal[s]" within the meaning of Cal. Bus. & Prof.

5    Code § 17601(a); (b) whether Defendant failed to present the automatic renewal offer terms, or

6    continuous service offer terms, in a clear and conspicuous manner before the subscription or

7    purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer,

8    in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (c) whether Defendant charged Plaintiffs' and

9    Class members' Payment Method for an automatic renewal service without first obtaining their

10   affirmative consent to the automatic renewal offer terms in violation of Cal. Bus. & Prof. Code §

11   7602(a)(2); (d) whether Defendant failed to provide an acknowledgment that included the

12   automatic renewal or continuous service offer terms, cancellation policy, and information on how

13   to cancel in a manner that is capable of being retained by Plaintiffs and the Class, in violation of

14   Cal. Bus. & Prof. Code § 17602(a)(3); (e) whether the goods and services provided by Defendant

15   are deemed an "unconditional gift" in accordance with Cal. Bus. & Prof. Code § 17603; (f)

16   whether Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"),

17   Cal. Bus. & Prof. Code §§ 17500, *et seq*., California's Consumers Legal Remedies Act ("CLRA"),

18   Cal. Civ. Code §§ 1750, *et seq*., and/or California's Unfair Competition Law ("UCL"), Cal. Bus. &

19   Prof. Code §§ 17200, *et seq*.; (g) whether Defendant's conduct alleged herein constitutes

20   conversion and/or unjust enrichment; (h) whether Plaintiffs and the Class are entitled to damages

21   and/or restitution; (i) whether Defendant should be enjoined from further engaging in the

22   misconduct alleged herein; and (j) whether Plaintiffs and the Class are entitled to attorneys' fees

23   and costs under California Code of Civil Procedure § 1021.5.

24        77.    **Typicality:** The claims of Plaintiffs are typical of the claims of the Class in that

25   Plaintiffs and the Class sustained damages as a result of Defendant's uniform wrongful conduct,

26   based upon Defendant's failure to comply with Cal. Bus. & Prof. Code §§ 17600, *et seq*., in

27   connection with its offerings of subscriptions to *The Athletic*.

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED         23

78.    **Adequacy:** Plaintiffs will fairly and adequately protect Class Members' interests. Plaintiff has no interests antagonistic to Class Members' interests, and Plaintiffs have retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

79.    **Superiority:** A class action is superior to the other available methods for the fair and efficient adjudication of this controversy for, inter alia, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, serves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

80.    Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

81.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs and members of the Class and will likely retain the benefits of their wrongdoing.

82.    Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

**COUNT I**
**Violations Of California's Unfair Competition Law ("Ucl"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

83.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

84.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

85.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" Cal. Bus. & Prof. Code § 17200.

86.    The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204.

1  Such a person may bring such an action on behalf of himself or herself and others similarly situated

2  who are affected by the unlawful and/or unfair business practice or act.

3        87.    As alleged below, Defendant has committed unlawful and/or unfair business

4  practices under the UCL by: (a) representing that Defendant's goods and services have certain

5  characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods

6  and services with the intent not to sell them as advertised, in violation of Cal. Civil Code §

7  1770(a)(9); and (c) converting to Defendant's own use and benefit money that rightfully belongs to

8  Plaintiffs and the Class.

9        88.    Additionally, at all relevant times, Defendant has violated, and continues to violate,

10 the UCL's proscription against engaging in unlawful and/or unfair conduct as a result of its

11 violations of the ARL, Cal. Bus. & Prof. Code §§ 17600, *et seq*. Specifically, Defendant failed, and

12 continues to fail, to: (a) provide the auto-renewal terms associated with its Athletic Subscription

13 "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and

14 ©n visual proximity[] … to the request for consent to the offer," in violation of Cal. Bus. & Prof.

15 Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms

16 before charging their Payment Method, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and

17 (c) provide an acknowledgment that includes the automatic renewal or continuous service offer

18 terms, cancellation policy, and information regarding how to cancel in a manner that is capable of

19 being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3). Defendant

20 also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their

21 Athletic Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(b).

22       89.    Each of these acts and practices constitutes an independent violation of the ARL,

23 and thus an independent violation of the UCL.

24       90.    All products received from Defendant in violation of the ARL, Cal. Bus. Prof. Code

25 §§ 17602, *et seq*., constitute "unconditional gifts." *See* Cal. Bus. Prof. Code § 17603. As a direct

26 and proximate result of Defendant's unlawful and/or unfair practices described herein, Defendant

27 has received, and continues to hold, unlawfully obtained property and money belonging to

28 Plaintiffs and the Class in the form of payments made by Plaintiffs and the Class for their The

Athletic Subscriptions. Defendant has profited from its unlawful and/or unfair acts and practices in the amount of those business expenses and interest accrued thereon. Defendant's acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

91.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

92.     Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public. Plaintiffs and the members of the Class have suffered a substantial injury in fact and lost money by virtue Defendant's acts of unfair competition, which caused them to purchase the Athletic Subscriptions. Had Defendant complied with its disclosure obligations under the ARL, Plaintiffs and members of the Class would not have purchased their Athletic Subscriptions or would have cancelled their Athletic Subscriptions prior to the renewal of the subscriptions, so as not to incur additional fees. Thus, Plaintiffs and members of the Class were damaged and have suffered economic injuries as a direct and proximate result of Defendant's unlawful and/or unfair business practices.

93.     Defendant's violations have continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful course of conduct. The public and the Class are subject to ongoing harm because the unlawful and/or unfair business practices associated with the Athletic Subscriptions are still used by Defendant today.

94.     Plaintiffs and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203 of all amounts that Defendant charged or caused to be charged to Plaintiffs' and the Class's Payment Method in connection with their Athletic Subscriptions during the four years preceding the filing of this Complaint. Defendant should be required to disgorge all the profits and gains it has reaped and restore such profits and gains to Plaintiffs and the Class, from whom they were unlawfully taken.

95.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and members of the Class

seek a court order enjoining Defendant from such future misconduct, and any other such orders that may be necessary to rectify the unlawful business practices of Defendant.

96.     Plaintiffs bring this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiffs and the Class are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

**COUNT II**
**Conversion**

97.     Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

98.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

99.     As a result of charges made by Defendant to Plaintiffs' and Class members' Payment Methods without authorization and in violation of California law, Defendant has taken money that belongs to Plaintiff and the Class.

100.     The amount of money wrongfully taken by Defendant is capable of identification. 89. Defendant engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 329©).

101.     As a result of Defendant's actions, Plaintiffs and the Class have suffered damages.

**COUNT III**
**Violations of California's False Advertising Law ("FAL"),**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***

102.     Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

103.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

104.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, … in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services,

professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

105.    Defendant committed acts of false advertising, as defined by § 17500, by intentionally making and disseminating statements to consumers in California and the general public concerning Defendant's products and services, as well as circumstances and facts connected to such products and services, which are untrue and misleading on their face and by omission, and which are known (or which by the exercise of reasonable care should be known) by Defendant to be untrue or misleading. Defendant has also intentionally made or disseminated such untrue or misleading statements and material omissions to consumers in California and to the public as part of a plan or scheme with intent not to sell those services as advertised.

106.    Defendant's statements include but are not limited to representations and omissions made to consumers before and after enrollment in Defendant's Athletic Subscriptions regarding the terms of payment for and cancellation of a consumer's automatic payments. Such representations and omissions on the Checkout Page constitute false and deceptive advertisements.

107.     Defendant's actions in violation of § 17500, as described herein, were false and misleading such that the general public is and was likely to be deceived.

108.    Plaintiffs and the members of the Class were deceived by Defendant's statements and omissions made online when they signed up and started paying for their Athletic Subscriptions, and there is a strong probability that other California consumers and members of the public were also or are likely to be deceived as well. Any reasonable consumer would be misled by Defendant's false and misleading statements and material omissions. Plaintiffs and other members of the Class did not learn of Defendant's cancellation and automatic payment policies until after they had already signed up and started paying for Defendant's Athletic Subscription. They relied on Defendant's statements and omissions to their detriment.

109.    Plaintiffs and the Class lost money or property as a result of Defendant's FAL violations because they would not have purchased the Athletic Subscriptions on the same terms if the true facts were known about the product and the Athletic Subscriptions do not have the

characteristics as promised by Defendant.

110.    Plaintiffs, individually and on behalf of all similarly situated California consumers, seek individual, representative, and public injunctive relief and any other necessary orders or judgments that will prevent Defendant from continuing with its false and deceptive advertisements and omissions; restitution that will restore the full amount of their money or property; disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable attorneys' fees.

**COUNT IV**
**Violations of of California's Consumers Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code §§ 1750, *et seq*.**

111.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

112.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

113.    Plaintiffs and the members of the Class are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that Plaintiffs and the Class sought or acquired Defendant's goods and/or services for personal, family, or household purposes.

114.    Defendant's selection and/or subscription offers are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b). The purchases by Plaintiffs and the Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

115.    The acts and practices of Defendant as described above were intended to deceive Plaintiffs and the Class as described herein, and have resulted, and will result, in damages to Plaintiffs and the Class. These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's acts and practices constitute representations or omissions deceiving that the Athletic Subscriptions have characteristics, uses, and/or benefits, which they do not, in violation of Cal. Civil Code §1770(a)(5); and (b) Defendant's acts and practices constitute the advertisement of the goods in question without the intent to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9).

116.     Plaintiffs and the Class suffered economic injury as a direct result of Defendant's misrepresentations and/or omissions because they were induced to purchase Athletic Subscriptions and/or pay renewal fees they would not have otherwise purchased and/or paid. Had Defendant fully and clearly disclosed the terms associated with the Athletic Subscriptions, Plaintiffs and the Class would have not subscribed to *The Athletic* or they would have cancelled their Athletic Subscriptions earlier, *i.e.,* prior to the expiration of the initial subscription period.

117.     Plaintiffs, on behalf of themselves and all other members the Class, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

118.     In compliance with the provisions of California Civil Code § 1782, Plaintiffs sent written notice to Defendant on January 18, 2023, informing Defendant of their intention to seek damages under California Civil Code § 1750. The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated." Accordingly, if Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiffs will amend their complaint to include a request for damages as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

### COUNT V
**Unjust Enrichment / Restitution**

119.     Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

120.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

121.     Plaintiffs and the Class conferred benefits on Defendant by purchasing the Athletic Subscriptions.

122.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs and the Class's purchases of the Athletic Subscriptions. Retention of those moneys under these circumstances is unjust and inequitable because Defendant's failure to disclose material terms

of the purchase agreement, in violation of California law, induced Plaintiffs and the Class to purchase the Athletic Subscriptions. These omissions caused injuries to Plaintiffs and the Class because they would not have purchased the Athletic Subscriptions at all, or on the same terms, if the true facts were known. Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class for its unjust enrichment, as ordered by the Court.

**COUNT VI**
**Negligent Misrepresentation**

123.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

124.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

125.    As discussed above, Defendant made misrepresentations and omissions to consumers before and after enrollment in Defendant's Athletic Subscriptions regarding the terms of payment for and cancellation of a consumer's automatic payments. Such representations and omissions on the Checkout Page constitute false and deceptive advertisements. Defendant omitted, failed to disclose, and intentionally concealed from such advertisements and related statements material facts concerning billing, shipping, cancellation, and automatic payment terms, policies, and requirements.

126.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

127.    At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Athletic Subscriptions and their associated terms.

128.    The negligent misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase and enroll in Defendant's Athletic Subscription program.

129.    Plaintiffs and Class members would not have purchased the Athletic Subscriptions if the true facts had been known.

130.    The negligent actions of Defendant caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

**COUNT VII**
**Fraud**

131.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

132.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

133.    As discussed above, Defendant provided Plaintiff and Class members with false or misleading material information and failed to disclose material facts about the Athletic Subscriptions and their associated automatic renewal terms, including terms regarding Defendant's cancellation policy and billing practices and policies. These misrepresentations and omissions were made by Defendant with knowledge of their falsehood.

134.    The misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase the Athletic Subscriptions.

135.    The fraudulent actions of Defendant caused damage to Plaintiffs and the members of the Class, who are entitled to damages and other legal and equitable relief as a result.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

A.    For an order certifying the Class, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

B.    For an order declaring that Defendant's conduct violates the statutes and common laws referenced herein;

1    C.    For an order finding in favor of Plaintiffs and the Class on all counts asserted

2          herein;

3    D.    For actual, compensatory, statutory, and/or punitive in amounts to be determined by

4          the Court and/or jury;

5    E.    For prejudgment interest on all amounts awarded;

6    F.    For an order of restitution and all other forms of equitable monetary relief;

7    G.    For injunctive relief as pleaded or as the Court may deem proper; and

8    H.    For an order awarding Plaintiffs and the Class their reasonable attorneys' fees,

9          expenses, and costs of suit.

10                                          **<u>JURY DEMAND</u>**

11         Plaintiffs demand a trial by jury on all causes of action and issues so triable.

12

13

14   Dated:  January 18, 2023          Respectfully submitted,

15                                     **BURSOR & FISHER, P.A.**

16                                     By:   <u>/s/ Neal J. Deckant</u>
17                                            Neal J. Deckant

18                                     Neal J. Deckant (State Bar No. 322946)
                                       Julia K. Venditti (State Bar No. 332688)
19                                     1990 North California Boulevard, Suite 940
                                       Walnut Creek, CA  94596
20                                     Telephone:  (925) 300-4455
                                       Facsimile:  (925) 407-2700
21                                     Email: ndeckant@bursor.com
                                             jvenditti@bursor.com
22
                                       **BURSOR & FISHER, P.A.**
23                                     Frederick J. Klorczyk III (State Bar No. 320783)
                                       888 Seventh Avenue
24                                     New York, NY  10019
                                       Telephone:  (646) 837-7150
25                                     Facsimile:   (212) 989-9163
                                       Email: fklorczyk@bursor.com
26
                                       Nick Suciu III*
27                                     **MILBERG COLEMAN BRYSON**
                                       **PHILLIPS GROSSMAN, PLLC**
28                                     6905 Telegraph Road, Suite 115

Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

Gary Klinger*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
221 West Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
gklinger@milberg.com

J. Hunter Bryson*
Zoe T. Aaron*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
hbryson@milberg.com
zaaron@milberg.com

*Attorneys for Plaintiffs and the Putative Class*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Neal J. Deckant, declare as follows:

1.       I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs Rebecca Kaplan, John Murphy, Johnny Pappas, Michael Tisa, and Charlene Egizi in this action. Plaintiff Kaplan alleges she is a citizen of Oakland, California, Alameda County; Plaintiff Murphy alleges he is a citizen of Highland, California, San Bernardino County; Plaintiff Pappas alleges he is a citizen of San Diego California, San Diego County; Plaintiff Tisa alleges he is a citizen of San Diego California, San Diego County; and Plaintiff Egizi alleges she is a citizen of Hermet California, Hermet County.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.       The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California, this 18th day of January, 2023.

_____
*/s/ Neal J. Deckant*
Neal J. Deckant